Next case is United States of America v. Sean Graves. Mr. Krause? Good morning, Your Honors. May it please the Court, my name is Ronald Krause. I represent Sean Graves, and I'd like to request three minutes for rebuttal. Granted. This appeal has two issues, one a denial of suppression motion, and the other is the application of the career offender enhancement for the North Carolina robbery convictions. With the Court's permission, I'd like to begin with the second issue, the career offender enhancement. I'd like to begin with that in part because our position really is quite similar to the government's position as we've analyzed this case. We've just come out with a different conclusion. As Your Honors know from the briefs, North Carolina robbery is a non-consensual taking of money or property by violence or fear, and that it can be violated by de minimis force. What we have to do in determining whether or not that's an enumerated robbery for the career offender statutes is follow the analysis that was set out by Your Honor Judge Hardiman in the Morero case, which is to look at various sources and to distill a generic definition of robbery from those sources. Now, we would concede, as the government said in its brief, that there is a split among the states about what the definition of generic robbery is, that the majority of the states do include theft by intimidation and putting a victim in fear. And if the Court were to adopt that majority position, then North Carolina robbery would be an enumerated robbery offense. Because it corresponds with a generic definition. Yes. So you want us to adopt the MPC's model penal codes minority? Well, I was just going to say, Your Honor, that you said in Morero that the model penal code is an ideal starting place in figuring out this analysis, and we agree with you and the ten states that define robbery with infliction of serious bodily injury and putting persons in fear of serious bodily injury. And so if the Court would adopt the model penal code and the minority position, then North Carolina robbery sweeps more broadly and it is not enumerated robbery. Now, the obvious question to ask then is, well, why should you follow the model penal code? I think the more apt question is, why not follow the model penal code? It might be our default position, but if there's a whole lot of case law going the other way, that does give us pause, right? Well, it might. On the other hand, consider that state legislatures that come up with these criminal codes are often not, these codes don't come from the greatest legal minds. And I think if you contrast that with those who are at the American Law Institute. Well, they come from the people, though. I mean, they do have that advantage, right? Or at least the representatives of the people. Well, that's true. And don't the people have a right to define what robbery is and what it isn't without the federal courts telling them they're not so smart? Should we define a statute by who wrote it? I'm sorry? Should we define a statute by who wrote it? Well, that was maybe a little. Sometimes those legal minds end up on federal courts. In fact, there was a House Judiciary Committee in Pennsylvania at one time, which I served on, ended up with five members sitting on the federal courts. Well, that can happen. And we wrote a lot of those criminal codes in Pennsylvania. Yes. So you've got to watch where you use that argument. Well, I understand that, Your Honor. There are exceptions. But the Third Circuit does have a tradition of following the model penal code. As early as 1961, Chief Judge Biggs adopted the model penal code definition of criminal mens rea in the United States v. Kearns case. And in 2012, the Third Circuit adopted the model penal code definition of criminal negligence. And there are other circuits that have said when there's this sort of split between state codes in coming up with the generic definition, the Fourth Circuit said that the model penal code provides the best generic contemporary and modern definition. And the Sixth Circuit said it relies on the model penal code to define generic aggravated assault when faced with state-to-state variations. So I think the model penal code definition is something that this Court should consider very strongly. I guess it's a very, I think, good, academic, interesting argument you're making, Mr. Krauss. But what I'm struggling with is even assuming that the model penal code is the better approach, is that really our task here or is our task to ascertain what North Carolina was up to? No, I think your task is to decide on a generic definition of robbery. Well, but we can give it a new definition even if the North Carolina statute, at the time your client was convicted, mapped on to a different standard. I guess I'm asking a question of timing. Is it relevant what we would now say about the North Carolina statute or is it more relevant to evaluate whether the North Carolina statute, at the time your client suffered a conviction there, was generic robbery? Well, the North Carolina statute has been what it is. The task in trying to decide whether it falls within the enumerated robbery definition for the career offender purposes, that requires this Court to come up with a definition for generic robbery. And you want us to define generic robbery contrary to the way most courts have defined it? That sounds like ungeneric robbery. I would say a majority of the courts, but there's some very fine courts, Texas, New Jersey, Virginia, that have followed the model penal code. How do you define fine? I'm sorry? How do you define fine? You said there are fine courts. Why should we give ten courts that are fine? Is that what I'm trying to get to? Is that what makes them fine? I'm just suggesting that the Court not make majority rule and quality of number of decisions necessarily the deciding factor. Well, that's a fair point. It's certainly possible that a majority of the courts have erroneously described generic robbery. That's the essence of your point. Yes. All right. Then perhaps you could give us something more persuasive than, hey, you know, the folks at the ALI are really smart, and I cite it in an opinion that the MPC is a good place to start, which certainly it is, but can you give us a more substantive reason as to why, on the substance, the MPC's definition is better than the majority view? Well, I think one reason would be that having robbery include serious bodily injury separates it more distinctly from mere larceny. Robbery, I think, in a lot of codes is actually considered to be aggravated larceny, and I think the majority view on generic robbery makes it more like just a slightly aggravated larceny. No, but still, okay. I pass on that question. May I move on to another point? Yes, sir. Okay. I want to move on to the suppression issue, and there were two points in the suppression issue, one that I'm going to touch on. One was that the stop itself was not based on reasonable suspicion, and the other is that the seizure of the drugs from the watch pocket exceeded the scope of a proper Terry stop. And I'd like to discuss the second one first, that the seizure of drugs from the watch pocket exceeded the scope of the proper protective frisk. I say that because in Dickerson, the object of a proper frisk is limited to what is necessary for the discovery of weapons. And the reason why the pat down of the watch pocket went beyond that scope is because, and this is a fact in the record that really hasn't been commented upon by anybody, you can't put a weapon in a watch pocket. There's no weapon to be looking for. Does it have to be a weapon, or could it be contraband? Well, a protective frisk is only looking for a weapon to protect the safety of the officer. Maybe it's a razor blade. If you want to get into sizes of pockets and sizes of weapons, maybe it's a razor blade. Although, I'm not sure that a pat down would ever feel a razor blade. Well, that's a different question.  You're saying contraband doesn't count. If he thinks he feels crack cocaine or something like that, that doesn't count? Well, my point is that the watch pocket is so small that he shouldn't even be patting it down. It would be almost as if he was wearing flip-flops and bare feet. You can't put heroin, stamp bags of heroin can't fit into small places? Oh, sure. But this is a protective frisk. He's only looking for weapons. But how do we know he doesn't have a weapon under his waistband in the area where the watch pocket is? Well, you could check the waistband, but skip over the watch pocket. Well, that seems rather awkward when you're doing a protective pat down to say, well, this area would be too small for a weapon, so I won't touch him there. Well, it might be a little impractical, but I would suggest that the purposes of the Fourth Amendment require police officers to take that extra step. Now, on the issue of the suppression stop itself, we argue that this was not a proper stop because there just weren't enough specific facts to permit it. I think one of the things to consider here is what Simmons did not see. Certainly, he got the report of the shots being fired in a certain area. He got the report of the two men leaving the area, going in his directions. He spotted the two men coming into his area. After that, there are really no specific objective concrete facts that you can point to. There was no one running away from these fellows who were supposedly these bad shooters. They never saw a gun, and there was no drug dealing that Simmons saw. All Simmons is able to do is to raise very subjective inferences about what he says he observed. He says he observed eye contact as he drove by graves, but he might have just as well, if he had not had eye contact, he could have said, well, he's not suspicious because he's trying to avoid me. Any one of those things, if you break them up, they're clearly not enough. They're little bricks in the wall. Yes. But there were several bricks in the wall, right? Well, that's true, but zero plus zero plus zero equals zero. All right. I think we understand your argument on that one. Thank you, Mr. Krause. We'll hear you on rebuttal. Thank you. Mr. Cerruti, would you mind starting where Mr. Krause did with the North Carolina conviction? Not at all, Your Honor. May it please the Court, Stephen Cerruti on behalf of the United States. I think Mr. Krause accurately said that our difference is a small one as far as the analytical framework. That being said, obviously the United States takes a very different position as to what should be used to define generic robbery. The MPC, while it may be a good starting place, as Your Honor has pointed out in the Marrero decision, is only one of the places that the Court is to look under both Taylor and your discussion in Marrero. And one of the other excellent places to look, or fine places to look, would be the majority definitions used by states around the United States. And as the Lockley Court examined, as the Hernandez-Galvan Court examined, and as Wayne LaFave in his treatise examined, a significant majority of the states in the Union define robbery in the sense where fear is enough. It doesn't require the serious bodily injury. How significant is the majority? Do we have an exact count? Well, in those cases, I think they added up the number as being 38, including North Carolina would be the fear or some level of force. So the broader standard, something on the order of 10 states, had the attachment to a severe bodily injury or bodily injury requirement. And I think there are a couple of states, and independently I looked at this as well, where it's kind of hard to fit them in one definition or the other. So, again, it is a significant majority of states. All right. But that doesn't make the persuasive view, Mr. Krause argues, that without the fear of injury, it seems like larceny. You know, why isn't there some virtue in more clearly distinguishing robbery from larceny? Well, there may be some virtue in that, but that's not the analysis. The job of this court in determining what generic robbery is, isn't deciding what it should be, but rather what it is, and basing that upon things like what the majority of states choose to call robbery. And that, I think, is a significant difference between the way the United States looks at it and the way that Mr. Krause and the defendant look at it. We're not making a qualitative analysis here. The MPC may be the better way. This court may feel that the MPC is the better way, but a significant majority of states. But it's not the way North Carolina chose to go? Is that your argument? It's not the way that North Carolina chose to go. All right. And how do we know that? How do we know that? Just by reading the statute? Correct. And that's what we have to go on about what they chose through using common law robbery. So does this mean that the federal courts are always bound to conclude that a generic version of robbery or any other crime is simply determined by polling the states to ascertain what the majority view is? Because generic seems to correspond, at least on some level, with majority. I think that would be the primary thing to look at in a situation where you have a significant difference in the numbers that go one way versus the other. I think if it was a much closer question, then maybe you look at more weight to the MPC or other legal treatises. But I think in this case, one of the positive aspects of going with a broader definition of generic robbery is it makes the guidelines clearer to those who may be considering or caught up in the legal system and facing what those guidelines impose. Do you think that criminals consider what the guidelines impose before they go out and commit a crime? I don't know that there have been any studies on that. I would like to think some of them maybe think about it. Otherwise, why go to the extent that we do to try and make them clear? But the outcome if we... I think for the lawyers, not the defendants. There are some lawyers who are defendants, so maybe they look at it. But the benefit I'm getting at is if you define generic robbery to be consistent with the majority number of states, and by being a broader definition, it would then also include those for the minority number of states, then you have the benefit of having robbery, as it's defined in the 50 states, be equivalent to what is referred to as robbery in the guidelines. But this is for a federal purpose. This is for when we're sentencing in federal courts. We want to have a consistent policy. And shouldn't we think about what we're trying to do in defining robbery when we think about what generic robbery ought to be? And shouldn't we think about career criminals? We are trying to distinguish who are the serious recidivists, who are a serious risk to society. And shouldn't that be the goal we have in mind when we're considering what generic robbery ought to be? And perhaps start with the model penal code where you have, again, lawyers and judges defining what this offense should entail for the purposes to be considered nationwide rather than just in North Carolina or Delaware or Pennsylvania. I think that's a noble goal. Again, I don't think that's really the role that the court is in in this type of case, though. You have the sentencing commission that has decided to say that robbery, in a generic sense, is appropriate for punishment under the career offender guideline. If it wanted to elevate or if it felt that robbery should include some level of serious bodily harm, then you're getting into a standard that is very similar to the element of the use of physical force as defined by Johnson in the Supreme Court decision in Johnson 2010. Well, if you're going to define robbery as needing to have an element that involves some sort of use of physical force, then you're turning the mentioning of robbery in the second clause of the career offender guideline into surpluses because it would otherwise be covered by the element of force clause in the first subsection of the guideline. So I think there is some intent on the part of the sentencing commission that you can read into this saying, well, we're going to decide that irrespective of whether there was a potential of serious bodily injury or serious use of physical force, these particular crimes are going to be serious enough to be considered violent felonies for the purposes of a sentencing enhancement. Has the generic definition of robbery changed over time? Is it evolving decade by decade or has it been fairly static for a long time? And that's my research into it, limited as it may be, did seem to leave it in a fairly static posture. Since many of the definitions of robbery, even those that are statutory, seem to track closely when we're talking about fear or use of some unidentified level use of force or violence to the common law definitions used in states like North Carolina, South Carolina, and I think a couple of others. So if the state statutory definitions of robbery or common law robbery have remained fairly static over time, then the generic definition will also be likely to stay static over time under the analysis that we're talking about here. With that, if there's no other questions on that particular issue, I'll briefly turn to the Fourth Amendment issue. As Your Honor, Judge Hardiman, you pointed out, the United States doesn't disagree that you take each one of the individual factors that Detective Simmons considered on their own, you would have a problem establishing reasonable suspicion. But he wasn't taking them on their own. He was taking them all together using his experience and training to inform what he viewed, his decision of what he viewed to be suspicious. It was not a hunch. It was not a hunch that Mr. Graves and his associate who left the scene before the detention was made and ultimately the arrest. It was not a mere hunch because there were gunshots fired. Multiple officers heard that. Multiple officers saw Graves and his associate leaving the area where the gunshots were fired. They provided a description. When Detective Simmons saw them, they matched the description. He then, using his experience and training, identified that Graves was walking in such a way that it appeared he might be trying to conceal or protect a weapon stored in his waistband. He observes them for a period of time, decides he wants to interact with them a little bit, makes eye contact with Mr. Graves who then responds with an arm signal that in, again, He then pulls his car over to the side a little ways down. By this point, the associate has left and Mr. Graves makes a beeline for his car to come over, presumably to consummate the informally agreed to potential drug transaction. You put all of those factors together. This was not a hunch. This was a trained officer who was faced with a number of factors and made the very reasonable assumption that there could be criminal activity at foot and it turned out he was right. If there are no further questions on that, that's all I have. Thank you, Mr. Cerruti. Thank you, Your Honor. Mr. Krause? Your Honors, I would just like to make one brief point and I make this very respectfully. And it's in accord with some of the work that the Court has been doing on eyewitness testimony, Judge McKee's panel, and some of the discussions at the recent Third Circuit Judicial Conference. And that is that the effect that events after you have engaged in some activity, that events after that can affect your memory of that activity. And that it's possible that some of the inferences that Officer Simmons made here are highly susceptible to that sort of change in memory. Aren't those credibility determinations, though? I mean, the District Court was surely free to make those findings, but it went the other way. Well, I'm not sure that that was addressed specifically. I raise it because I think... Well, if it wasn't joined to the District Court, we can't really consider it now, right? I guess what I'm saying is that you make a plausible argument that could be made to the District Court, and even if it sounded like the argument wasn't made, and if it wasn't made, it's forfeited. If it was made, the District Court's credibility findings went very much in favor of the officer, right? Well, I would just respectfully ask the Court to consider that as something to consider as you decide on Officer Simmons' inferences. Okay. Quick question on North Carolina. Do you take issue at all with what Mr. Cerruti said about 38 states versus 10 states? No, I believe that's correct. Okay. Thank you, Mr. Crouse. Thank you. Court appreciates the very helpful, excellent argument. We'll take the matter under advisement. Thank you, Your Honor.